UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re<br><br>    ORDWAY RESEARCH INSTITUTE, INC.,<br><br>                      Debtor. | Chapter 11<br>Case No. 11-11322-1 |

## DECLARATION IN SUPPORT OF FIRST DAY MOTIONS

PAUL J. DAVIS, M.D., pursuant to 28 U.S.C. § 1746, declares under the penalty of perjury:

1.      I am the Director of Ordway Research Institute, Inc. ("Debtor").  As Director, I am responsible for the day-to-day operations of Debtor.  This declaration is based upon my personal knowledge and the records maintained by Debtor in the ordinary course of its business.  This declaration is submitted in support of the first day motions filed by Debtor in this chapter 11 bankruptcy proceeding (collectively, the "First Day Motions").  Capitalized terms not otherwise defined herein have the meanings given to them in the First Day Motions.

### Background

1.      On April 28, 2011 (the "Petition Date"), Debtor commenced this bankruptcy proceeding by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

2.      Debtor is continuing in possession of its property and is operating and managing its business as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4.      Debtor is a New York not-for-profit corporation and is tax-exempt under section 501(c)(3) of the Internal Revenue Code.

5.      Debtor was formed in 2002 to facilitate inter-institutional and interdisciplinary collaborations in basic and translational biomedical research in New York's Capital District. Debtor is based in the Center for Medical Sciences (CMS), a 150,000 square-foot research facility located at University Heights in Albany. Debtor's primary purpose is to perform basic medical and clinical research to develop preventions and treatments for a wide range of diseases. Debtor's research is focused on drug development in cancer, emerging infections and signal transduction/endocrinology.

6.      As of the Petition Date, Debtor had 35 full-time employees and 9 part-time employees.

7.      Between July 1, 2010 and April 26, 2011, Debtor generated revenue of $6,566,271 (unaudited). As of April 26, 2011, Debtor had approximately $12,158,202 in assets and $17,108,847 in liabilities (unaudited).

8.      Debtor is currently a tenant in the Center for Medical Sciences located at 150 New Scotland Avenue, Albany, New York. The Center for Medical Sciences is owned by Center for Medical Sciences, Inc. ("CMS"), a New York not-for-profit corporation.

9.      The Center for Medical Sciences was built by CMS in 2002 through funding provided by certain bonds. On June 15, 2002, CMS and Ordway entered into a lease for approximately 60,000 square feet of space located in the Center for Medical Sciences (the "Lease"). Upon information and belief, the rent set forth in the Lease was based upon the amount due for debt service on the bonds.

10.      Debtor's assets, including its books and records, are located at Debtor's premises in the Center for Medical Sciences. Debtor does not hold any assets that are located outside of the territorial limits of the United States.

**The KeyBank Loans**

11.     As of the Petition Date, Debtor was obligated and indebted to KeyBank National

Association ("KeyBank") as evidenced, *inter alia,* by the following instruments:

> (1)     A $500,000.00 Promissory Note issued by Debtor to KeyBank dated
>
> May 8, 2008 (the "500M Note"); and
>
> (2)     A $1,000,000.00 Promissory Note issued by Debtor to KeyBank dated
>
> June 30, 2010 (the "1MM Note").

12.     On May 8, 2008, Debtor executed a Commercial Security Agreement (the "2008

Security Agreement") pursuant to which Debtor granted KeyBank a security interest in certain of

Debtor's personal property, including Debtor's accounts, chattel paper, instruments, deposit

accounts, money, other rights to payment and performance, and all proceeds of the foregoing, as

security for any then-existing or thereafter arising obligations of Debtor to KeyBank.

13.     KeyBank filed a UCC-1 financing statement in connection with the 2008 Security

Agreement on June 12, 2008.

14.     On June 30, 2010, Debtor executed a Commercial Security Agreement (the "2010

Security Agreement") pursuant to which Debtor granted KeyBank a security interest in certain of

Debtor's personal property, including Debtor's accounts, chattel paper, instruments, deposit

accounts, money, other rights to payment and performance, and all proceeds of the foregoing, as

security for any then-existing or thereafter arising obligations of Debtor to KeyBank.

**The KeyBank Equipment Financing**

15.     As of the Petition Date, Debtor was obligated and indebted to Key Equipment

Finance, Inc. ("KEF") under that certain Master Lease Agreement dated as of April 20, 2009

(together with related schedules, the "Equipment Lease") pursuant to which KEF provided $2,794,318 of equipment financing to Debtor.

16.     KEF filed a UCC-1 financing statement in connection with the Equipment Lease on September 25, 2009.

17.     To the extent that KEF asserts a security interest in any of Debtor's property, such security interest is limited to the equipment that is the subject of the Equipment Lease.  Debtor did not grant KEF a security interest in any of Debtor's cash collateral.

### The Marty and Dorothy Silverman Foundation Loan

18.     As of the Petition Date, Debtor was obligated and indebted to the Marty and Dorothy Silverman Foundation (the "Silverman Foundation") pursuant to a Promissory Note in the amount of $3,500,000 dated June 21, 2010 (the "$3.5MM Note").

19.     As security for the $3.5MM Note, Debtor granted the Silverman Foundation a Mortgage and Security Agreement dated June 21, 2010 (the "Mortgage and Security Agreement").  Pursuant to the terms of the Mortgage and Security Agreement, Debtor granted the Silverman Foundation a mortgage upon certain real property located at 130 New Scotland Avenue, Albany, New York (the "Armory") (with an appraised value of $1,350,000 as of November 9, 2007) and a security interest in certain "Miscellaneous Property, Equipment Leases and Rents" as defined in the Mortgage and Security Agreement.

20.     On July 6, 2010, the Silverman Foundation filed a UCC-1 financing statement in connection with the Mortgage.  On March 9, 2011 (less than 90 days prior to this bankruptcy proceeding), the Silverman Foundation recorded the Mortgage.

21.     Upon information and belief, the cash collateral at issue in this case does not arise from any "Miscellaneous Property, Equipment Leases and Rents" or the proceeds thereof.  As a

result, Debtor does not believe that the Silverman Foundation has a security interest in the cash collateral that is the subject of the Cash Collateral Motion (defined below).

## The First Day Motions

**A.**  **Debtor's Motion Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 503(b) and 507 and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure for Entry of Interim and Final Orders Approving use of Cash Collateral (the "Cash Collateral Motion")**

22.  Debtor has requested KeyBank's consent to the use of cash collateral and is currently negotiating with KeyBank for a consensual resolution.  Upon information and belief, neither KEF's security interest nor the Silverman Foundation's security interest extends to the cash collateral at issue, and, as a result, Debtor does not require the consent of KEF or the Silverman Foundation as a condition to the use of such cash collateral.

23.  To the extent that a creditor's consent is required for the use of cash collateral and such creditor is not willing to provide such consent, Debtor seeks an Order authorizing the use of cash collateral in accordance with the Budget attached to the Cash Collateral Motion as Exhibit A.  Debtor believes that any such creditor's interest would be adequately protected because (i) the Budget indicates that no diminution of cash collateral is anticipated, (ii) Debtor is willing to grant such a creditor a replacement lien on postpetition collateral with the same priority as existed prior to Debtor's bankruptcy filing, and (ii) the value of the Armory may be offered as security to protect against any diminution of cash collateral.

24.  Based upon the foregoing, in this case, a secured creditor with an interest in cash collateral will be adequately protected from any diminution in value of the cash collateral.

**B.**  **Motion of Debtor and Debtor-in-Possession for an Order Authorizing Payment of (A) Prepetition Employee Wages, Salaries, Commissions, and Other Compensation; (B) Prepetition Employee Benefits; and (C) Prepetition Employee Business Expenses (the "Prepetition Wages, Benefits, and Expenses Motion")**

25.     The dedicated and active participation of Debtor's officers, directors, and employees is essential to Debtor's continued, uninterrupted operations, and is essential to the orderly administration of this Chapter 11 case.

26.     As of the Petition Date, Debtor's employees were owed or had accrued various sums for: (a) wages, salaries, commissions, and other compensation, (b) certain employee benefits, including health and dental insurance, life insurance, accidental death and dismemberment insurance, disability insurance, paid holidays, paid sick and personal days, paid vacation, severance, 401(k) pension plans, relocation expenses, employee discounts, and other similar, customary employee benefits; and (c) reimbursement of employee business expenses.

**Wages, Salaries, Commissions, and Other Compensation**

27.     In the ordinary course of their business, Debtor employs approximately 35 full-time and 9 part-time employees, as well as 1 independent contractor.  Debtor's customary bi-weekly gross payroll (including taxes) is approximately $125,000 ("Compensation Obligations").

28.     All of Debtor's employees are paid by direct deposit.  Debtor's employees are generally paid on a bi-weekly basis 14 days in arrears.  For example, on April 22, 2011, Debtor's employees were paid their salaries and wages earned for the two weeks prior (i.e. April 3-16, 2011).  Debtor's employees have a claim for such prepetition wages.  In addition, Debtor's employees who are paid on a bi-weekly basis are due to be paid again on May 6, 2011 for the period of April 17, 2011 through April 29, 2011, twelve (12) days of which are prepetition (the amount owed by the Debtors for such prepetition period is estimated to be approximately $138,000).  The Debtor estimates that the total amount owed for the prepetition Payroll Obligations is $138,000.

**Employee Benefits**

29.     In the ordinary course of business, Debtor has established various employee benefit plans and policies for the benefit of its employees, including health and dental insurance, life insurance, accidental death and dismemberment insurance, disability insurance, paid holidays, paid sick and personal days, paid vacation, severance, 401(k) pension plans, relocation expenses, and other similar, customary employee benefits (collectively, the "Employee Benefits Obligations"). Debtor estimates that, as of the Petition Date, its accrued and unpaid obligations in respect of the Employee Benefits Obligations aggregate approximately $500,000 (of which approximately $300,000 represents accrued vacation and sick days that would be paid in the ordinary course of business).

30.     In addition, Debtor utilizes the services of certain professionals and consultants in the ordinary course of their businesses in order to facilitate the administration and maintenance of their books and records in respect of Employee Benefits (the "Administrative Obligations"). Debtor estimates that approximately $23,000 was accrued and unpaid on account of services provided to Debtor by such professionals and consultants prior to the Petition Date.

**Employee Business Travel and Entertainment Expenses**

31.     In addition, Debtor customarily reimburses its employees who incur business travel and entertainment expenses in the ordinary course of performing their duties on behalf of Debtor (the "Reimbursement Obligations"). This category includes business expenses incurred by the employees through the use of corporate or personal credit cards. Because the employees do not always submit claims for reimbursement promptly, it is difficult for Debtor to determine the exact amount outstanding at any particular time. Some employees may not have submitted requests for expense reimbursement prior to the Petition Date, and certain checks issued to

employees for expense reimbursement may not have been honored by Debtor's bank prior to the Petition Date. Debtor estimates that, as of the Petition Date, the prepetition Reimbursement Obligations total approximately $39,000, not including any business expenses for which checks were issued prior to the Petition Date but which had not been honored prior to the Petition Date.

**Bank Accounts**

32.     The Compensation Obligations, Employee Benefits Obligations, Administrative Obligations, and Reimbursement Obligations (referred to collectively as the "Prepetition Employee Obligations") are predominantly paid from the following account (the "Payroll Account") maintained at the following bank (the "Payroll Bank"):

| Institution | Payroll Account Number |
|---|---|
| Key Bank | 325870004190 |

**Necessity of Entry of the Prepetition Wages, Benefits, and Expenses Motion**

33.     As a result of the commencement of Debtor's chapter 11 case, and in the absence of an order of the Court providing otherwise, Debtor will be prohibited from paying or otherwise satisfying the Prepetition Employee Obligations, and wire transfers and direct deposit transfers in respect of the Prepetition Employee Obligations will be dishonored or rejected. For the reasons set forth below, Debtor believes that such a result would have a significant adverse effect on the Debtor's employees, their morale and, correspondingly, Debtor's reorganization efforts.

34.     Debtor believes that the majority of employees are owed less than $11,725 per employee in respect of the Prepetition Compensation Obligations. Accordingly, all such claims constitute priority claims and would be required to be paid in cash under any chapter 11 plan

confirmed in these cases.  See 11 U.S.C. § 1129(a)(9)(B).  Given the adverse consequences that could result if payment is not made, Debtor submits that the payment of such amounts at this time is necessary and appropriate.

35.     With respect to the employees owed in excess of $11,725, payment of such amounts is appropriate and may be authorized under section 105(a) of the Bankruptcy Code and the "necessity of payment" doctrine.  It is essential to Debtor that the morale of those key employees be maintained during the cases.

36.     Debtor's creditors will not be prejudiced by the proposed payment of Prepetition Employee Obligations.  To the contrary, such payment will inure to their benefit through the uninterrupted continuation of Debtor's business operations.

37.     The continued operation of Debtors' business and its successful reorganization depend on the retention of the service of its employees.  Consequently, it is critical that the Debtor continue its ordinary course personnel policies, programs and procedures that were in effect prior to the Petition Date.  If the checks issued and fund transfers requested in payment of the Prepetition Employee Obligations are dishonored, or if such accrued obligations are not timely paid postpetition, Debtor's employees may suffer extreme personal hardship and may be unable to pay their daily living expenses.  Further, it would be inequitable to require Debtor's employees to bear personally the business expenses that were incurred on behalf of Debtor with the expectation that they would be reimbursed.

38.     Accordingly, payment of all Prepetition Employee Obligations is in the best interests of Debtor, its estate and creditors, and will enable Debtor to continue to operate its business in an economic, efficient manner without disruption.  Debtor's employees are central to its operations and are vital to their reorganization.  A significant deterioration in their morale at

this critical time undoubtedly would have a devastating impact on Debtor, its customers, the value of its assets and business and its ability to reorganize. The total amount to be paid if the authorization sought herein is granted is relatively modest compared with the size of Debtor's estate and the importance of Debtor's employees to the rehabilitation effort.

**C.      Motion of Debtor and Debtor-in-Possession for an Order Pursuant to 11 U.S.C. §§ 105, 363, 1107, and 1108 Authorizing (i) the Maintenance of Existing Bank Accounts and (ii) the Continued use of Existing Business Forms (the "Cash Management Motion")**

**Debtor's Existing Bank Accounts**

39.      Prior to the commencement of this chapter 11 case, in the ordinary course of its business, Debtor maintained three (3) bank accounts to manage cash receipts and disbursements (the "Bank Accounts"). The Bank Accounts include a main operating account (the "Main Account"), a payroll account, and a flex spending account. A list of these accounts is attached to the Cash Management Motion as Exhibit A. Debtor believes that the Bank Accounts are in a financially stable banking institution with FDIC or FSLIC insurance (up to an applicable limit per account).

40.      A waiver of the United States Trustee's requirement that the prepetition Bank Accounts be closed and that new postpetition bank accounts be opened is required to avoid a significant disruption in Debtor's business and impairment of Debtor's efforts to reorganize.

41.      Accordingly, in order to avoid delays in payments to administrative creditors, to ensure as smooth a transition into chapter 11 as possible with minimal disruption, and to aid in Debtor's efforts to successfully and rapidly complete this reorganization, it is important that Debtor be permitted to continue to maintain the Bank Accounts.

42.     Further, if the relief requested in the Cash Management Motion is granted, Debtor represents that it will not pay, and each of the banks will not be directed to pay, any debts incurred before the Petition Date, except as may be authorized by this Court.

**Debtor's Existing Checks, Correspondence and Business Forms**

43.     Parties doing business with Debtor undoubtedly will be aware of Debtor's status as a chapter 11 debtor-in-possession as a result of bankruptcy notices and press coverage of these cases.  Changing correspondence and business forms would be expensive, unnecessary and burdensome to Debtor's estate, disruptive to Debtor's business operations, and would not confer any benefit upon those dealing with Debtor.  As a result, Debtor should be authorized to use existing checks and business forms without being required to place the label "debtor-in-possession" on each.

**D.      Motion of Debtor and Debtor-in-Possession Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for Authorization to (i) Continue Workers' Compensation Program and Liability and Property Insurance Policies, and (ii) Pay Premiums in Respect of Such Program and Policies (the "Insurance Policies Motion")**

**Debtor's Worker's Compensation Program**

44.     In connection with the daily operation of its business, Debtor maintains a program that provides Debtor's employees with the workers' compensation benefits required by applicable state law (the "Workers' Compensation Program").  Maintenance of a workers' compensation program is essential to the continued operation of Debtor in the states in which it currently conducts business.

45.     In the State of New York, Hartford Insurance Group (collectively, "Insurance Co.") is Debtor's insurer under a workers' compensation insurance policy (the "Workers' Compensation Policy").  Insurance Co. processes and pays valid claims submitted by Debtor's employees that are payable under the terms of the Workers' Compensation Policy.  Under the

terms of the Workers' Compensation Policies, Debtor must pay the premiums billed by the insurance company in a timely fashion.

46.     Debtor maintains a fully insured Workers Compensation Policy which has no retroactive adjustments (excluding annual audits of payroll after policy expiration) or deductibles/retentions. No security was required or posted.

**Debtor's Other Insurance Policies**

47.     In connection with the daily operation of their business, Debtor also maintains certain property and liability insurance policies (collectively, the "Insurance Policies") with respect to, inter alia, Property Insurance including Equipment Breakdown, Business Interruption Insurance, General Liability, Products Liability, Automobile Liability, Foreign Liability, Umbrella Liability, Crime, and Directors' and Officer's Liability including Employment Practices Liability. The names of the Insurance Policy carriers and the type of coverage are set forth in Exhibit A to the Insurance Policies Motion.

48.     The premiums for each of the Insurance Policies are paid directly to the insurance carriers with various installment options, with the exception of Directors and Officers Liability which is billed annually in advance. The General Liability and Workers Compensation are rated based on either payroll and/or sales and are audited at the end of the policy term. There are no retrospectively rated insurance policies.

**Continuation of the Workers' Compensation Program and Insurance Policies**

49.     Subject to this Court's entry of an order granting the Insurance Policies Motion, Debtor proposes to make all such payments in accordance with the terms of the various Insurance Policies and the Workers' Compensation Program.

50.     Debtor's creditors will not be prejudiced by the proposed payment of prepetition amounts related to the Workers' Compensation Program and Insurance Policies.  To the contrary, such payments will inure to their benefit through the continuation of the Debtors' business operations.

51.     The risk that eligible claimants will not receive payments with respect to employment-related injuries may have a devastating effect on the financial well-being and morale of the employees and their willingness to remain in Debtor's employ.  Departures by employees at this critical time may result in a disruption of Debtor's business to the detriment of all parties in interest.  A significant deterioration in employee morale at this critical time undoubtedly will have a substantial adverse impact on Debtor, the value of its assets and businesses and its ability to reorganize.  It is essential to the continued operation of Debtor's business and its efforts to reorganize that the Workers' Compensation Program be maintained on an ongoing and uninterrupted basis.

52.     Debtor must also continue to keep its Insurance Policies, which provide a comprehensive range of coverage and protection for Debtor and its property, in full force and effect.  If these policies were allowed to lapse, Debtor would be forced to shop for alternate coverage at undoubtedly higher premiums or be exposed to substantial liability for any damages resulting to persons and property of Debtor and others.  Moreover, Debtor would have to bear the costs and expenses of defense litigation arising from any such damage.  Furthermore, maintenance of the Insurance Policies is mandatory under the guidelines of the Office of the United States Trustee.  Maintenance of the directors' and officers' liability policies is necessary to the retention of senior management and directors of the company.

53.     The amounts to be paid as reimbursement for prepetition claims paid or to be paid under the Workers' Compensation Program, prepetition premiums and other amounts due under the Workers' Compensation Program, and premiums due and owing or accrued as of the Petition Date with respect to the Insurance Policies as well as any additional premiums that may become due under the Insurance Policies as a result of adjustments at the end of the policy term is minimal compared with the size of the estates, the importance of employees to the entire rehabilitation effort, and the potential liability exposure of Debtor absent insurance coverage. The maintenance of these policies and the payment of premiums and other amounts with respect to the Insurance Policies is amply justified and, in the case of the Workers' Compensation Program, mandatory under state law.

**E.      Motion of Debtor and Debtor-in-Possession for an Order Determining Adequate Assurance of Payment for Utility Services (the "Utilities Motion")**

54.     Debtor currently utilizes gas, water, electric, telephone and other utility services provided by the Center for Medical Sciences and National Grid (the "Utility Companies"). Given that the Utility Companies provide essential services to Debtor's continuing business operations, any interruption in utility services could prove devastating.  In fact, the temporary or permanent discontinuation of utility services could irreparably disrupt Debtor's business operations and, as a result, fundamentally undermine Debtor's reorganization efforts.

55.     Debtor believes that it will have sufficient debtor-in-possession financing to promptly pay all of its respective obligations to the Utility Companies for postpetition utility services on an ongoing basis and in the ordinary course of its business.  Moreover, all such claims will be entitled to administrative priority treatment under sections 503(b) and 507(a)(1) of the Bankruptcy Code.

56.     The relief requested in the Utilities Motion will ensure that Debtor's efforts to continue its business during the pendency of this bankruptcy case will not be disrupted.  The relief requested in the Utilities Motion provides the Utility Companies with a fair and orderly procedure for determining requests for additional or different adequate assurance.  Without the Determination Procedures, Debtor could be forced to address numerous requests by Utility Companies in a disorganized manner at a critical period in this chapter 11 case and during a time when Debtor's efforts could be more productively focused on operating its business for the benefit of all parties in interest

I declare under penalty of perjury that the foregoing is true and correct.  Executed on April 29, 2011.

s/ Paul J. Davis
PAUL J. DAVIS, M.D.